STATE OF MONTANA, Plaintiff and Respondent, *v.* ROBERT R. PETERSON, and MARY D. PETERSON, Defendants and Appellants.

No. 10055.

Submitted September 21, 1960. Decided November 14, 1960.

356 P. 2d 925.

Stanley M. Doyle, Polson, appeared for appellants and argued the cause orally.

Geoffrey L. Brazier, Helena, amicus curiæ.

Anthony F. Keast, Missoula, appeared for respondent and argued the cause orally.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of conviction entered on a jury verdict against two defendants for the crime of operating a milk establishment, handling, collecting and preparing milk for distribution to consumers without a license, a misdemeanor. Judgment was in the amount of $2.50 fine against each defendant.

Basically, the facts to be fairly gleaned from the record are these: The defendants, man and wife, lived in their home in Missoula. They operated a dairy farm at Moiese through a hired man or at least an agent. Milk from the dairy was taken to a cheese factory, in part; and in part collected or delivered to the defendants' home where individual consumers took delivery in their own containers. The Livestock Sanitary Board officers endeavored to inspect the herd, test the milk, and finally to require a license and conformance with the Sanitary Code and Regulations. The officers met resistance, or at least a complete lack of cooperation. In September of 1958, some sort of conditional sales contract arrangements were made by defendants by which alleged contracts they sold the milch cows individually to the individual consumer, continuing to operate in the same way. This arrangement, which by reading of the record can only be classed as an ill-disguised subterfuge, was apparently an effort to get away from licensing and sanitation requirements. The consumers and the defendants were happy with their own arrangements, but the public officials charged with the duty of enforcing the laws and regulations as to milk production and distribution were not. At any rate, the defendants were arrested and charged with misdemeanor.

The foregoing statement of fact is made, although neither brief conforms to our rules in setting forth the facts. Trial was had resulting in convictions and the very nominal fines of $2.50 being levied against each defendant. At the conclusion of. the trial, new defense counsel took over, and made a motion for new trial on various grounds. The motion for new trial was denied, and this appeal followed.

■ The appellants set forth nine specifications of error some of which appear trivial or are not set out in accordance with our rules. Therefore, we shall ignore some of the arguments of counsel and go to the heart of the case. An amicus curiæ appearance by brief and argument was made by counsel for the Montana Milk Control Board on the constitutionality phase of the Montana Milk Control Act, Chapter 204 of the Laws of 1939, as amended by Chapter 192 of the Laws of 1959. However, even though the brief of amicus curiæ is well presented, we are unable to see from the record before us where any question of constitutionality has been properly raised or presented.

The only question that need be considered herein is as to whether a fair trial was had. The record reveals a somewhat bitter contest between the prosecution and defense. The trial judge was quite lenient in allowing testimony in. It would not be desirable herein to set forth the many numerous exchanges between counsel and comments by the court, but certain ones will point out what we consider prejudicial error in the conduct of a trial by the prosecutor and court.

It should be said here that the county attorney, who prosecuted, represented the State on the appeal. In oral argument the county attorney acknowledged improper conduct on his part in the trial, attempted to excuse it as an "unfortunate outburst" and argued that in any event it was not prejudicial to the rights of the defendants to have a fair trial. These matters were presented to the trial court in the motion for new trial, but were not thought by the trial judge to be prejudicial.

From the record the following appears:

"(Note: The court then read section 46-207 to the Jury again.)

"The Court: That question is settled so far as this case is concerned.

"Mr. Goldman: That is the farm, not in their house.

"The Court: You may be right on that point.

"Mr. Keast: If your Honor please, the statute says any lot, place—

"The Court: If they are using the house for the milk purposes, they would have the right to go in there.

"Mr. Goldman: If it's part of the house, no; that's for the jury to determine.

"The Court: Well, I will leave that to the jury.

"Mr. Goldman: Anyway, I offer this in evidence now.

"The Court: Well, just a minute, I am not through. Now, section 27-422 provides for penalties. 'Any person required by this act to be licensed,'—that refers to the section I just read—'who shall produce, sell, distribute, or handle milk in any way except as a consumer, without first having obtained a license, as required of him by this act, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine not exceeding six hundred dollars ($600.00). Each day's violation of this provision shall constitute a separate offense. A violation of any provision of this act or of any lawful rule or order of the board, including a failure to answer subpoena or to testify before the board, shall be deemed a misdemeanor punishable by a fine not exceeding six hundred dollars ($600.00) * * *'.

"Now, in that regard, as to punishment, the State of Montana in this case is not asking for any heavy penalty. What this case is for, and why it's brought is to get settled definitely in the State of Montana the law in regard to these dairies. And as far as the court's concerned, it doesn't make any difference, if you find them guilty, if you fine them one dollar, that will settle the law.

"Mr. Goldman: May it please the Court, we will object to that, the remark of the Court, for the purpose of the record, as it is highly prejudicial.

"The Court: I said if they find them guilty the Court

would be satisfied with a fine of one dollar. I don't see how that hurts you any. * * *"

Mrs. Mary D. Peterson, one of the defendants, who had been previously called and sworn as a witness, was recalled as a witness in her own behalf, and testified, on direct examination by Mr. Goldman, as follows:

"Q. Now, you are the same Mrs. Peterson who was testifying on direct examination here—

"Mr. Keast: The state will so stipulate.

"Q. All right. I believe the last question I asked you was what happened after you heard a knock at the door; what was your answer to that?

A. Well, my child ran to the door and opened it, and a man stepped into the room.

"Q. And—

"Mr. Keast: At this time, Your honor, may I take a minute of the Court to ask one of my men to go down and bring my secretary up? *I like to take her testimony down in shorthand and have it available in my office in case of a possible perjury action.* I will take it until she arrives.

"Mr. Goldman: You've got the Court Reporter. Doesn't he trust the Court Reporter?

"Mr. Keast: The Court Reporter, Mr. Wonter, is a circuit court reporter, and travels quite extensively with Your Honor, and is quite busy and away very often. I like to have the notes in my office in case the necessity arises.

"The Court: We will be at ease a moment.

"Q. What happened after—

"The Court: He wants to wait. Let me see your instructions.

"Mr. Goldman: I think you can step down in the meantime. (All parties awaited the arrival of the secretary from the county attorney's office. Upon her arrival, Mrs. Peterson resumed the witness stand.)

"The Court: All right, you may proceed.

"Mr. Keast: Would you speak loud enough so we may get this down, Mrs. Peterson? A. I will try to. * * *

"The Court: The secretary can sit right over here so you can hear better, if you want to, sit right over there.

"Mr. Keast: Very good. * * *

"Q. All right, Now, Mrs. Peterson, what happened then after the search was made?

"Mr. Keast: To which we object, Your Honor, that is highly prejudicial.

"The Court: Well, ladies and gentlemen of the jury, I read that long statute to you, and I again repeat—

"Mr. Goldman: May I make an objection, Your Honor, at this time to the reading of that statute? We are proceeding strictly under Article III, section 7 of the Constitution of the State of Montana, and the 4th — not the 5th Amendment, but the 4th Amendment to the Constitution of the United States.

"We know that any laws passed by the Legislature, no matter how they may be interpreted, can never abrogate or destroy the Constitution of the State of Montana or the Constitution of the United States.

"The Court: Well, you can make that objection a little later.

"Mr. Goldman: I merely say this, that the reading of that again, Your Honor, we object to it.

"The Court: I am not going to read it, I am going to explain my position to the jury.

"Mr. Goldman: Object on the grounds it is prejudicial.

"The Court: Overruled. As I view the case now, unless I change my view later on, the question is whether these parties, these defendants, were violating said section 46-232. Now, I am going to let in all that happened out there, I am not going to — as you noticed during this case, I let both sides put in their testimony. They don't agree; that's true in most law suits, as you know. If the parties all agree, why

of course we wouldn't have any law suits. But the way I view it right now is that the question is whether they were selling the milk, conducting a milk plant in violation of section 46-232. Now they are raising some points about some search and seizure here; I am going to let that in. I don't know what that's going to lead to. I will overrule the County Attorney.

"Mr. Keast: We have no objections to testimony coming in, we want it to come in. I just have an objection as to the question the way it was phrased. *I want her to testify, that's why I got my secretary up here, in case there is a possible perjury suit here.*

"Mr. Goldman: We will object to the remark of the County Attorney here of a possible — I ask for a mistrial.

"The Court: Overruled.

"Mr. Goldman: That man has no right to make that statement, Your Honor. This is the most rank kind of an accusation to make in a courtroom. This woman is telling the truth. The only thing I can say, Your Honor, and I will say this so help me God, that the only things that have been said in this case and that capital case that are not true are — have come from the County Attorney's office, and I hurt down here when that happens, Your Honor.

"The Court: You want to give the Court a chance to rule.

"Mr. Goldman: I think that's the most terrible thing that could happen in a courtroom by a remark of that kind by the County Attorney, trying to threaten to coerce this witness into fear.

"The Court: Well, the jury will pay no attention to the remarks of counsel on either side. That doesn't have anything to do with the case. * * *

"Mr. Goldman: That's all, Mrs. Peterson.

"Mr. Keast: No questions, Mrs. Peterson, thank you very much.

"Mr. Goldman: We will ask Mr. Keast to apologize to this witness for threatening her with perjury. He hasn't offered to cross-examine her.

"The Court: The Court's ruled on that.

"Mr. Goldman: He hasn't offered to cross-examine her, Judge.

"Mr. Keast: I don't have to cross-examine the witness, your Honor, that's my prerogative, and I just stated to the Court the purpose of having my secretary here, which is completely legal.

"The Court: Very well.

"Mr. Keast: Nothing in the law says I have to cross-examine the witness if I am satisfied with her testimony."
Emphasis supplied.

■ The partial quotation of the exchanges themselves answer the question on this appeal. The theatrical nature of the performance in threatening a defendant with perjury charges in such a manner before a jury by the elected county prosecutor is prejudicial error. The inflammatory nature of the performance is patent when considered in the light of the entire record.

We recognize the general rule, with rare exceptions arising from extreme cases, that prejudice created by unwarranted statements of counsel in the presence of the jury is sufficiently cured by an admonition by the court to the jury to wholly disregard such statements. Carroll v. United States, 9 Cir., 1907, 154 F. 425; State v. Bloor, 20 Mont. 574, 52 P. 611.

But here, the trial judge's comments were such that he could not cure the error by any admonition.

As to conduct of prosecuting attorneys, it is said in 42 Am. Jur., Prosecuting Attorneys, § 20, pp. 255, 256, that:

"In criminal prosecutions, it has been said that it is as much the duty of prosecuting attorneys to see that a person on trial is not deprived of any of his statutory or constitutional rights as it is to prosecute him for the crime with

which he may be charged. The public interests, however, demand that a prosecution should be conducted with energy and skill. While the prosecuting officer should see that no unfair advantage is taken of the accused, yet he is not a judicial officer. Those who are required to exercise judicial functions in the case are the judge and the jury. The public prosecutor is necessarily a partisan in the case. If he were compelled to proceed with the same circumspection as the judge and jury, there would be an end to the conviction of criminals. Zeal in the prosecution of criminal cases is therefore to be commended and not condemned. If convinced of the defendant's guilt, he should, in an honorable way, use every power that he has to secure his conviction. At the same time, it is the duty of the prosecuting attorney, who represents all the people and has no responsibility except fairly to discharge his duty, to hold himself under proper restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive the defendant of the fair trial to which he is entitled; and it is as much his duty to refrain from improper methods calculated to bring about a wrongful conviction as it is to use every legitimate means to bring about a just one. It is the duty of the prosecutor to see that nothing but competent evidence is submitted to the jury; and, above all things, he should guard against anything that would prejudice the minds of the jurors, and tend to hinder them from considering only the evidence introduced. He should never seek by any artifice to warp the minds of the jurors by inference and insinuations.''

The insinuation that one of the defendants, Mrs. Peterson, was not going to speak truthfully and the threat and intimidation in the manner revealed by this record is prejudicial error.

For the foregoing reason, the judgments are reversed· and the cause remanded for new trial.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICE ANGSTMAN, concur.

MR. JUSTICE BOTTOMLY dissenting:

I cannot agree with the disposition of this case, as set forth in the majority opinion.

From the facts in this record, it appears that good, hardworking citizens, who were attempting to meet the high cost of milk for their children, formed under a contract, a self-owned and serving place for the processing of the milk from their own herd of milch cows. A little diplomacy exercised by the representatives of the Milk Control Board and the county and state officials would have, without doubt, corrected any errors, if any.

Instead, the defendants were hounded by the prosecuting attorney, and on the trial were unmercifully browbeaten. This is one of the most unfair, unjust and immoral proceedings and trials that has been brought to my attention in almost fifty years in the law:

First of all, this Milk Control Board Act of 1939, enacted as Chapter 204, Laws of 1939, and as amended, was one of several ''war measures'' passed about the time of the ''Blue Eagle'', all for the purpose of temporarily steadying and stabilizing industries and the prices of commodities. In this particular industry of milk, the owners of dairy herds were losing money because hardly anyone had the money to buy, people by the thousands were going to shipyards, to war industries, into service, etc., herds were being sold, and without these restrictive measures milk would have been practically unobtainable. So, pioneering individualism and private enterprise was ditched for the sheltering protection of the State and Federal laws.

When the war was over, however, such fair trade laws were carried on as a form of subsidy to the industry as agriculture's parity is carried on.

For the reasons stated, and the shameful conduct of the prose-

cution, I would reverse the judgments and order the record in the district court stricken.

MR. JUSTICE ADAIR, dissenting:

This is a petty case. The two appellants were accused, tried and convicted of the crime of handling and distributing milk without a license. They have appealed to this court from judgments of conviction entered on a jury's verdict, adjudging that each appellant pay a fine in the trifling sum of $2.50.

Section 49-125, R.C.M. 1947, says: "The law disregards trifles."

The prosecutor's conduct at the trial, as shown by the record before us on this appeal, shocks the conscience, disregards the statutes regulating orderly procedure and violates the rights guaranteed the appellants under our Constitutions, both State and Federal.

This court should forthwith set aside, vacate and annul the judgments, and order the unqualified dismissal of the entire proceeding in the trial court.

The prosecution started out as a $2.50 proceeding. It winds up in the same trifling amount.